**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | | |
|---|---|---|
| SNIDER TIRE, INC.<br>D/B/A SNIDER FLEET SOLUTIONS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.: 7:23-cv-02407-TMC |
| | ) | |
| JONATHAN NELSON,<br>JIM WHITEHEAD TIRE SERVICE, INC.,<br>SCOTT CHAPMAN, JAMES L.<br>WHITEHEAD, JR. | )<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
ORDER TO SHOW CAUSE WHY DEFENDANTS JIM WHITEHEAD TIRE SERVICE,
INC., SCOTT CHAPMAN, AND JAMES L. WHITEHEAD, JR. SHOULD NOT BE
HELD IN CONTEMPT OF COURT FOR VIOLATION OF PRELIMINARY
INJUNCTION ORDER, AND OR IN THE ALTERNATIVE, MOTION FOR
PRELIMINARY INJUNCTION**

Plaintiff Snider Tire, Inc. d/b/a Snider Fleet Solutions, through counsel, files its

Memorandum of Law in Support of its Motion for Order to Show Cause why Defendants Jim

Whitehead Tire Service, Inc., Scott Chapman, and James L. Whitehead, Jr., (hereafter collectively

"Whitehead Defendants") Should Not be Held in Contempt of Court for Violation of Preliminary

Injunction Order, and or in the alternative, Motion for Preliminary Injunction.

## I.    PRELIMINARY STATEMENT

This case concerns the Defendants' unlawful scheme to engage in an egregious and

widespread misappropriation of Plaintiff's most highly confidential information and trade secrets,

breaches of restrictive covenants in an employment agreement, tortious interference with

contractual obligations and duties of loyalty, and resulting loss of customers and confidentiality.

This case presents the proverbial fox in the henhouse scenario.  Specifically, Snider's former

1

Business Development Manager, Defendant Jonathan Nelson, conspired with the Whitehead Defendants, both while he was employed with Snider and thereafter while he was being paid to honor his noncompete, to misappropriate a trove Snider's confidential and trade secret information which the Whitehead Defendants used along with Nelson's active assistance to unfairly compete against Plaintiff. Defendants' widespread misappropriation, which occurred repeatedly over a period of many months and is believed to be ongoing, has and continues to subject Plaintiff to loss of customers, profits, confidentiality, and competitive position. These facts are not reasonably disputed.

A Preliminary Injunction was entered by this Court against Defendant Nelson which has been blatantly violated by the Whitehead Defendants as "Covered Persons" under the Order after being given notice. Specifically, the Whitehead Defendants have failed to comply with the Court's Order by failing to return and preserve Plaintiff's confidential information, and by refusing to cease doing business that was developed or implemented with the use of Plaintiff's confidential and trade secret information.

It is important to note that after the Whitehead Defendants were added as parties, they took the position that they had not engaged in any wrongdoing. It was only recently that Whitehead, through counsel, admitted that Defendant Chapman did receive Snider documents from Defendant Nelson and accessed them. In their responses to the First Amended Complaint, Whitehead Defendants stated that they "encouraged Defendant Nelson to comply with any contractual obligations" owed to Snider, that they "did not request Snider information," that "the information was not useful," and "was not used or relied upon." (ECF 34 ¶¶ 41, 47, 48, 50, 51, and 52.) They also indicated that they would return to Plaintiff its confidential documents. (*Id.*) Based on these assertions Plaintiff withdrew its Motion for Expedited Discovery. Unfortunately, evidence now

confirms that Whitehead Defendants' representations and stated intentions were demonstrably false.

Specifically, it is now known that the Whitehead Defendants in many instances requested Snider confidential information from Defendant Nelson, in other instances the misappropriated documents were disseminated by and between the Whitehead Defendants, in another instance the documents were emailed from a Whitehead Tire employee's personal Internet email account to his company email account, and the Whitehead Defendants have failed to return exclusive possession to Plaintiff of its confidential information and remain in possession of it. Despite their proclamations otherwise, it is obvious that the Whitehead Defendants strongly desired Plaintiff's information and used it.

Despite the Whitehead Defendants' misappropriation and hide-the-ball tactics, limited discovery continues to reveal the Whitehead Defendants' substantial role in the unfair competition scheme. Just recently, the Whitehead Defendants produced documents revealing numerous new instances of misappropriation not previously known pertaining to literally hundreds of Snider customers.

Despite the undisputed evidence, the Court's Order and the Defendants' promises, Whitehead Defendants refuse to return to Snider exclusive possession of its property and continue to possess and have access to Snider's confidential and trade secret information. This along with discovery of new instances of misappropriation, and Whitehead Defendants' continued servicing of accounts developed or implemented with the use of Plaintiff's confidential information necessitated the filing of the instant Motions to prevent further irreparable harm.

## II.     **PROCEDURAL BACKGROUND**

On June 1, 2023, Plaintiff filed a Complaint against Defendant Nelson, and sought, *inter alia*, a preliminary injunction. *See generally* Compl. (ECF No. 1); *see also* Pltf.'s Mot. for a

Temporary Restraining Order and Preliminary Injunction (ECF No. 8, filed June 2, 2023) *and* Memo. in Support (ECF No. 8-1, filed June 2, 2023).

On June 14, 2023, with Defendant Nelson's consent, the Court entered a Consent Order for Preliminary Injunction (ECF No. 17) (the "Injunction"). The Injunction applies to "Defendant Jonathan Nelson, his agents, employees, representatives, and attorneys *and any other person acting in concert or participating with him* (collectively, 'Covered Persons')[.]" *Id.* at 1 (emphasis added). The Injunction prohibits Covered Persons from, among other things: accessing, using, destroying, disclosing, or sharing Plaintiff's confidential information and trade secrets, requires Covered Persons to maintain, preserve, and return Plaintiff's confidential information and trade secrets (paper and electronic copies), and prohibits Covered Persons from "conducting, carrying on, or engaging in any competitive business that was developed and/or implemented in whole or in part, directly or indirectly, through the use of any of Plaintiff's Trade Secrets and/or Confidential Information." *Id.* at 1-2.

On September 8, 2023, after learning more about the Whitehead Defendants' active involvement in the misappropriation, specifically documents sent to Defendant Chapman, Plaintiff filed its First Amended Complaint against Nelson and added the Whitehead Defendants as parties asserting claims against them for violation of the Defend Trade Secrets Act, Computer Fraud and Abuse Act, Tortious Interference with Contract, Aiding and Abetting a Breach of Duty of Loyalty, Civil Conspiracy, Unjust Enrichment, and Quantum Meruit. (ECF No. 22.) The Whitehead Defendants as alleged in the First Amended Complaint have encouraged and solicited Nelson during his employment with Snider and thereafter to violate his duties of loyalty owed to Snider, violate his contractual obligations as to nondisclosure, nonsolicitation, and noncompetition, in order to access and use Plaintiff's confidential information and trade secrets and obtain an unfair competitive advantage and unfairly solicit and steal away Plaintiff's customers. (*See id.* at 11-15.)

Whitehead Defendants' refusal to produce relevant evidence, particularly their computer devices used to misappropriate and unfairly compete, and their communications with Plaintiff's customers necessitated Plaintiff filing a Motion to Compel on March 6, 2024 (ECF No. 63).

### III.    FACTS AND BACKGROUND APPLICABLE TO BOTH MOTIONS

The following facts and background are relevant to both Plaintiff's Motion for Order to Show Cause and Sanctions, and Plaintiff's Motion for a Preliminary Injunction.[1]

#### A.  Snider's Business

1. Snider is engaged in the business of selling and servicing of truck tires for commercial vehicles, the manufacture of retreaded commercial truck tires, industrial forklift tires, as well as the sale of servicing related products for use in the commercial truck industry. Plaintiff also sells and services light, medium and heavy trucks and trailers, forklifts, and other types of equipment for fleets and other companies. Snider does business throughout the Southeast including in the State of South Carolina. (ECF No. 1, ¶ 10.)

2. Snider has developed and maintains confidential and trade secret information concerning its business including, without limitation information related to its products, services, and customers which provides the Company with a competitive advantage. (ECF No. 1, ¶ 11.)

3. Snider seeks to protect the confidentiality of its confidential and trade secret information by entering into employment agreements containing confidentiality and return of property covenants with certain key employees, by requiring computer passwords to access confidential information, by maintaining policies on confidentiality, and by limiting access to confidential information to employees that need the information to carry out their job duties. (ECF No. 1, ¶ 12.)

#### B.  Defendant Nelson's Employment with Snider and Voluntary Resignation

1. Defendant Nelson was employed by Snider from March of 2010 until he voluntarily resigned and separated from Snider on January 27, 2023. (ECF No. 1, ¶ 13.)

---

[1] The facts in Plaintiff's Initial Complaint (ECF No. 1) were Verified. The attachments to certain emails and texts at Exhibits 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 15, 16, 18, 19, 20, 21, 22, 25, and 27 contain Snider Confidential Information and can be produced as necessary including in camera or as may be ordered by the Court.

2. Defendant Nelson held the position of Business Development Manager for the State of South Carolina for Snider at the time he voluntarily resigned. (ECF No. 1, ¶ 14.)

3. In order to perform his duties Defendant Nelson was privy to and given access to certain Snider confidential and trade secret information. Specifically, Defendant Nelson was granted access to extensive customer information, pricing information, business prospects, profit margins, and product information. (ECF No. 1, ¶ 16.)

4. As a condition of receiving an increase in compensation Defendant Nelson executed on Employment Agreement (the "Agreement") with Snider on or about December 28, 2020, attached hereto as Exhibit A. (ECF No. 1, ¶ 17.)

5. On January 27, 2023, Defendant Nelson gave notice of his intent to voluntary resign from his employment with Snider. (ECF No. 1, ¶ 21.)

6. Defendant Nelson's last day of employment with Snider was January 27, 2023. (ECF No. 1, ¶ 22.)

7. Shortly after Defendant Nelson's separation Snider invoked its right to enforce the noncompete provision in paragraph 6 (Covenant Not to Compete/Solicit/Interference), and as provided for under that paragraph began compensating Defendant Nelson his annual base salary during the period of restriction. (ECF No. 1, ¶ 23.)

## C. Nelson Misappropriates Snider Confidential and Trade Secret Information and Breaches his Restrictive Covenants

1. After Defendant Nelson's separation from employment, Snider heard from a customer that Defendant Nelson would be joining Snider's direct competitor, Defendant Jim Whitehead Tire Service, Inc., after his paid noncompete period expired. (ECF No. 1, ¶ 24.)

2. Activity within the territory previously managed by Defendant Nelson for Snider caused Snider to believe Defendant Nelson may be competing in violation of the terms of his employment agreement with Snider. (ECF No. 1, ¶ 25.)

3. Snider reviewed Defendant Nelson's computer history and learned that two days after his last day of employment with Snider Defendant Nelson had downloaded numerous Snider files containing Snider confidential and trade secret information. (ECF No. 1, ¶ 26.)

4. On January 29, 2023, at 2:03 a.m., two days after Defendant Nelson's last day of employment with Snider, Defendant Nelson accessed Snider's computer network through an 0ffice365 account and downloaded 16 files containing Snider business information, including confidential and trade secret information. See Exhibit B, Declaration of Laurance Lieb, ¶17. (ECF No. 1, ¶ 27.)

5. The information contained in the files accessed and downloaded by Snider include confidential customer prospect lists, confidential pricing

information, which includes profit margin information, and confidential customer information. (ECF No. 1, ¶ 29.)

6. Forensic analysis of Defendant Nelson's company-assigned laptop revealed that Nelson first connected an ASolid generic USB drive, serial number 364548 14&0 ("ASolid USB drive"), to the laptop on December 14, 2022 and then last connected the ASolid USB drive to the laptop on January 25, 2023 at 8:15p.m. *See* Exhibit B, Dec. of Lieb, 23. Forensic analysis revealed Nelson backed up his Snider email account to the ASolid USB drive on December 15, 2022, at 2 :27 a.m. *See id.* at, 24. (ECF No. 1, ¶ 30.)

7. Forensic analysis revealed Defendant Nelson accessed the ASolid USB drive on January 25, 2023, at 8:20 p.m. and accessed the following files and folders: (ECF No. 1, ¶ 31.)

8. The files contained on the ASolid USB device include confidential customer information, confidential product information, and confidential pricing information. The files contained on the ASolid USB device were largely not relevant to Defendant Nelson's job duties at Snider but would allow him to directly compete with Plaintiff. (ECF No. 1, ¶ 32.)

**D.  Defendant Nelson Sends Confidential Documents to the Whitehead Defendants Whom Requested Confidential Information, Shared it Internally, and Interfered with Nelson's Legal Obligations Owed to Plaintiff.**

1. On August 25, 2022, Defendant Nelson, while employed with Snider, e-mailed Jason McDowell who had just recently assumed the position of Whitehead Tire's Business Development Manager for the State of South Carolina, a detailed and highly confidential document entitled "Continental and General OTR – Individual Pricing" containing confidential product pricing information including pricing levels for various types of customers. (See Email at **Exhibit 1**.)

2. On September 9, 2022, Defendant Nelson emailed to Whitehead Tire's Business Development Manager Jason McDowell's personal email a confidential Snider document entitled "MRT MM Oliver Vipal Retreat (Pricing 08-01-2022).xlsx." (See Email at **Exhibit 2**.)

    o On September 10, 2022, Mr. McDowell forwarded Snider documents to Whitehead Tire Account Manager Chris Harley. (*Id.*)

3. On September 9, 2022, Defendant Nelson while employed with Snider emailed to Whitehead Tire's Business Development Manager Jason McDowell confidential pricing documents for Plaintiff's vendors Hankook and Yokohama.  Nelson's email was sent to Mr. McDowell's personal emails address (jasonmc10891@gmail.com). (See Email at **Exhibit 3**).

    o On September 10, 2022, McDowell emailed these documents to Whitehead Tire Account Manager Chris Harley.

> - On September 16, 2022, McDowell emailed the documents to his Whitehead Tire email address (Jason.McDowell@jimwhiteheadtire.com).

4. On September 10, 2022, Defendant Nelson emailed confidential product pricing for Sumitomo which contains Snider's pricing levels for various types of customers to Whitehead Tire Manager Jason McDowell. (See Email at **Exhibit 4**.)

> - On September 10, 2022, McDowell emailed the documents to Whitehead Tire Account Manager Chris Harley.

5. On November 15, 2022, Defendant Nelson, while employed with Snider, emailed Whitehead Tire Account Manager Darrin Motes a forty-nine-page document entitled "Sales Customer Ranking Report" which contained detailed confidential sales and customer information pertaining to hundreds of Snider customers in the Greenville sales territory. (Email at **Exhibit 5**.)

6. On December 5, 2022, Defendant Nelson texted Whitehead's Business Development Manager Jason McDowell the contact information for Snider customer U.S. Lumber including the name of the key contact person, his mobile telephone number, and e-mail address. (Text at **Exhibit 6**.)

7. On December 14, 2022, Defendant Nelson texted Whitehead's Business Development Manager Jason McDowell the address for Snider customer Westrock (also known as Kapstone) and the name of the contact person for that customer telling McDowell it is an "Important customer of mine" and instructing McDowell to "come." (Text at **Exhibit 7**.)

8. On December 15, 2022, Defendant Nelson while still employed with Snider, emailed Whitehead's Business Development Manager Jason McDowell a document entitled "Greenville Customer Ranking.TXT" which contained Snider confidential information including pricing, purchase history, and margins. (Email at **Exhibit 8**.)

> - On December 23, 2022, Mr. McDowell forwarded Snider's confidential document to Whitehead Manager Defendant Scott Chapman. (*Id.*)

9. On December 19, 2022, Defendant Nelson emailed to Whitehead's Business Development Manager Jason McDowell a 143-page document entitled "Copy of JON NELSON Target List.xlsx" which contained a compilation of confidential information regarding prospective customers. (Email at **Exhibit 9**.)

> - On December 23, 2022, Mr. McDowell forwarded Snider's confidential document to Whitehead Manager Defendant Scott Chapman. (*Id.*)

8

10. On January 9, 2023, Defendant Nelson emailed to Whitehead's Business Development Manager Jason McDowell a ninety-three-page document entitled "Columbia Customer Ranking Report" which contained highly confidential and detailed pricing information for hundreds of Snider customers. (Email at **Exhibit 10**.)

   o On January 18, 2023, Whitehead's Business Development Manager Jason McDowell emailed the "Columbia Customer Ranking January 2023" document to Defendant Scott Chapman, who one day later, emailed that document to Whitehead Tire Account Manager Chris Harley. (*Id.*)

11. On January 17, 2023, Defendant Nelson emailed Whitehead's Customer Sales Representative Scott Chapman, with confidential information related to Snider Tire customer Brick Haulers, Inc. Specifically, Nelson sent a confidential file entitled "BHI Product Ranking Report 2022.TXT" containing confidential information regarding Brick Haulers, including, without limitation: pricing information, profits margins for particular products, top-selling products, and dollar profits. In this same e-mail Nelson provided Whitehead Tire with the identities of the key contact people at Brick Haulers including the key decision-maker. (Email at **Exhibit 11**; Declaration of Jonathan Nelson ¶ 15 at **Exhibit 28**.)

12. On January 17, 2023, Defendant Nelson while still employed with Snider, provided Whitehead Tire via an e-mail to Whitehead Manager Scott Chapman, with the contact information for Snider Tire customer Pinnacle Trailer and provided Snider confidential file entitled "Pinnacle Product Ranking 2022" containing confidential information such as: pricing information, profit margins for particular products, top-selling products, and dollar profits. Nelson also provided Whitehead Tire in an email with the name of the customer contact person at Pinnacle. Scott Chapman asked Nelson for this information. (Email at **Exhibit 12**; Declaration of Jonathan Nelson ¶ 16 at **Exhibit 28**.)

13. On January 17, 2023, Defendant Nelson, while still employed with Snider, texted Whitehead Manager Scott Chapman the phone number and identity of the contact person for Snider customer Piedmont Concrete. Defendant Scott Chapman asked Nelson for this information. (Text at **Exhibit 13**; Declaration of Jonathan Nelson ¶ 17 at **Exhibit 28**.)

14. On January 17, 2023, Defendant Nelson, while still employed with Snider, provided Whitehead Tire, via an e-mail to Whitehead Manager Scott Chapman, with the key customer contact person for Snider customer Tucker Materials. (Email at **Exhibit 14**; Declaration of Jonathan Nelson ¶ 18 at **Exhibit 28**.)

15. On January 17, 2023, Defendant Nelson, while employed with Snider, e-mailed Whitehead's Business Development Manager Jason McDowell a highly confidential and detailed ninety-nine-page pricing and sales history report entitled: "Columbia Customer Ranking January 2023.TXT" which contained detailed and customer specific pricing information for hundreds of Snider customers. (See Email at **Exhibit 15**.)

   o On January 18, 2023, McDowell further disseminated this document by e-mailing it to Whitehead Tire Account Manager Chris Harley. (*Id.*)

16. On January 17, 2023, Defendant Nelson, while still employed with Snider, emailed Whitehead's Customer Sales Representative Scott Chapman, with the contact information for Snider customer Piedmont Concrete and confidential information related to Piedmont Concrete's account via a file entitled "Piedmont Concrete Product Ranking 2022.TXT" which contains Snider Tire confidential information including without limitation: pricing information, profit margins for specific products, top-selling products, and dollar profit.  Defendant Chapman asked Nelson for this information. (Email at **Exhibit 16**; Declaration of Jonathan Nelson ¶ 22 at **Exhibit 28**.)

17. On January 19, 2023, Defendant Nelson, while still employed with Snider, provided Whitehead Tire, via a text message to Defendant Scott Chapman, with the contact information for Snider's vendor Rubber Trac Solutions and an attached file containing confidential pricing information.  Upon being provided Snider's document, Scott Chapman responded to Nelson by text message stating: "Pricing looks pretty strong." (Text at **Exhibit 17**; Declaration of Jonathan Nelson ¶ 19 at **Exhibit 28**.)

18. On January 19, 2023, Defendant Nelson provided Whitehead Tire, via an e-mail to Defendant Chapman, documents entitled "Spreadsheet pricing" and "11347 List Price.xlsx," which contained Snider confidential and pricing information.  Scott Chapman asked Nelson for this information. (Email at **Exhibit 18**; Declaration of Jonathan Nelson ¶ 20 at **Exhibit 28**.)

19. On January 19, 2023, Defendant Nelson emailed to Whitehead's Account Manager Darrin Motes confidential Snider documents containing pricing and sales history for Snider customer Morgan Concrete. (See Email at **Exhibit 19**.)

20. On January 19, 2023, Defendant Nelson emailed to Whitehead's Account Manager Darrin Motes confidential Snider documents containing pricing and sales history for Snider customer Buddy Moore Trucking. (See Email at **Exhibit 20**.)

21. On January 19, 2023, Defendant Nelson emailed to Whitehead's Account Manager Darrin Motes confidential Snider documents containing pricing and sales history for Snider customer Jeff Lynch. (See Email at **Exhibit 21**.)

22. On January 19, 2023, Defendant Nelson emailed to Whitehead's Account Manager Darrin Motes confidential Snider documents containing pricing and sales history for Snider customer St. Clair. (See Email at **Exhibit 22**.)

23. On January 20, 2023, Defendant Nelson, while still employed with Snider, provided Whitehead's Customer Sales Representative Scott Chapman a file entitled "Snider Trac Container Pricing" which contained Snider confidential pricing information. Defendant Chapman asked Nelson for this information. (Text at **Exhibit 23**; Declaration of Jonathan Nelson ¶ 21 at **Exhibit 28**.)

24. On January 20, 2023, Whiteheads Account Manager Darrin Motes texted Defendant Nelson stating: "Can you send me information on Thyson Krupp please." To which Nelson replied "yes." On or around this time ThyssenKrupp advised that it was transferring all its work to Defendant Whitehead Tire. (Text and Email at **Exhibit 24**.)

25. On January 25, 2023, Defendant Nelson emailed Whitehead's Account Manager Darrin Motes a confidential document entitled "Anderson County.TXT" which contained confidential Snider pricing and sales history information. (Email at **Exhibit 25.**)

26. On April 20, 2023, Whitehead's Account Manager Darrin Motes texted Defendant Nelson, who was being paid to honor a noncompete period, requesting an "old invoice" for Snider customer Piedmont Concrete. (Text at **Exhibit 26**.)

27. On February 14, 2024, Defendant Nelson, after his voluntary resignation and during his paid noncompete period, emailed to Whitehead Tire's Business Development Manager Jason McDowell confidential documents pertaining to Snider customer Blanchard Equipment entitled "Customer Ranking – Blanchard Equipment.xlsx" which contained confidential pricing information, margins, products sold, and sales history. (See **Exhibit 27**.)

**E.      Whitehead Defendants' Have Made Material Misrepresentations to the Court[2]**

From the onset of this case, Whitehead Defendants have claimed no wrongdoing and stated their intentions to be transparent and to return to Plaintiff its property. Based substantially on those representations on December 20, 2023, Plaintiff withdrew its Motion for Expedited Discovery. However, the record evidence now confirms that the Whitehead Defendants had been

---

[2] Defendant provides this information to explain the timing of its Motions and why preliminary injunctive relief is particularly needed in this case. Plaintiff reserves the right to later bring one or more motions pursuant to FRCP 37, § 1927, or pursuant to other applicable authority.

misrepresenting the facts and their intentions. Specifically, Whitehead Defendants have misrepresented in pleadings filed with the Court as follows:

    **1.  Misrepresentations Regarding Their Conduct.**

Whitehead Defendants have made numerous misrepresentations regarding their alleged misconduct including as follows:

- "These Defendants did not encourage or solicit Defendant Nelson to breach any agreement with Plaintiff." (ECF 35, pg. 2) (10-2-2023.)

- "By way of further response, Defendants encouraged Defendant Nelson to comply with any contractual obligations he may owe to Snider." (ECF 35, pg. 4; ECF 34 ¶ 41) (10-2-2023.)

- "Nelson has never worked for or has been paid by JWT." (ECF 35, pg. 4) (10-2-2023.)

- "Defendants are not using any confidential information of Plaintiffs." (ECF 35, pg. 4) (10-2-2023.)

- "Defendants have not used any of the information contained in the referenced emails from Defendant Nelson to solicit business." (ECF 35, pg. 4) (10-2-2023.)

- JWT did not use any information owned by Snider to procure clients, and it has never employed Nelson. (ECF 58, pg. 2) (1-26-2024.)

The evidence confirms that each of the Whitehead Defendants' aforementioned representations were blatant misrepresentations of the truth. The facts are that Defendant Nelson was regularly assisting the Whitehead Defendants during the last five (5) months his employment with Plaintiff and for months thereafter during his paid noncompete period, and it is now known that in several instances the Whitehead Defendants solicited Nelson's help and requested him to provide them with Plaintiff's confidential information and documents. (See Section III *supra*; **Exhibits 24, 26;** Declaration of Jonathan Nelson ¶¶ 10-17, 20-22, 26 at **Exhibit 28.**) Whitehead Defendants also shared the documents misappropriated amongst themselves (see **Exhibits 2, 3, 4, 8, 9, 10, 15**). Accordingly, Nelson was essentially working for Whitehead Tire's benefit and

sharing Plaintiff's sales and customer playbook with the Whitehead Defendants while getting paid by Plaintiff, the Whitehead Defendants were encouraging Nelson to violate his legal obligations owed to Plaintiff, and the Whitehead Defendants were using Plaintiff's information even sharing it amongst themselves. (*Id*.) For the Whitehead Defendants to represent otherwise in its pleadings has been an apparent effort to deceive Plaintiff and the Court.

### 2. Misrepresentations Regarding Their Promises to Return to Plaintiff its Confidential Information.

Whitehead Defendants have made numerous demonstrable misrepresentations regarding their promises and intentions to return to Plaintiff its confidential information, including:

- "Upon appearing in this Lawsuit, Chapman, Whitehead and Jim Whitehead Tire immediately agreed to retain, segregate, isolate, and destroy any emails and/or files that Snider contends were provided to JWT by Nelson." (ECF 35, pg. 2) (10-2-2023.)

- "Defendants are willing to cooperate with Plaintiff's requests for information. They are willing to return and have returned the emails and attachments." (ECF 35, pg. 4) (10-2-2023.)

- Nelson sent emails to JWT which JWT has gathered and delivered to Snider. (ECF 58, pg. 2) (1-26-2024.)

- "Defendants will create images of the devices of Whitehead and Chapman" (ECF 35, pgs. 3-4) (10-2-2023.)

Rather than return to Plaintiff its documents as promised, the Whitehead Defendants only returned the several misappropriated documents that they knew Plaintiff was aware of as alleged in Plaintiff's First Amended Complaint. It was not until over four (4) months after they made the aforementioned representations, on February 14, 2024 and then March 5, 2024, that the Whitehead Defendants produced numerous additional documents belonging to Plaintiff that they had misappropriated and that Plaintiff was learning of for the first time. And despite advising the Court that they would preserve the data on the devices of Defendant Chapman and Defendant Whitehead

Jr., they have steadfastly refused to produce those devices for inspection to Plaintiff's expert or a neutral forensic examiner.

Ironically, while the Whitehead Defendants refuse to produce their computer devices known to be included in the Defendants' misappropriation of Plaintiff's trade secrets, they have simultaneously requested in their most recent discovery requests the image of Defendant Nelson's laptop. Therefore, under Whitehead's reasoning: They can steal Snider's confidential information and then turn around and forensically review Snider's devices yet they do not have to produce their devices known to have been used in the Defendants' misappropriation.

To add insult to injury, it is also apparent that Whitehead did not segregate or isolate Plaintiff's Confidential Information as it claimed to have done as Whitehead Tire's Customer Sales Representative, Jason McDowell, emailed to Whitehead's counsel numerous Snider documents on February 14, 2024. (See **Exhibits 3, 10, 27.**) Accordingly, Whitehead Tire has never segregated or isolated Plaintiff's confidential documents as it has represented in its pleadings.

## VI.  WHITEHEAD DEFENDANTS SHOULD BE ORDERED TO SHOW CAUSE WHY THEY SHOULD NOT BE HELD IN CONTEMPT

The Whitehead Defendants should be held in civil contempt for violating this Court's Preliminary Injunction Order in several distinct ways.

### A. Legal Standards

The Eleventh Circuit Court of Appeals has described the procedure for seeking an order to show cause in the following way:

> Precedent dictates that a plaintiff seeking to obtain the defendant's compliance with the provisions of an injunctive order move the court to issue an order requiring the defendant to show cause why he should not be held in contempt and sanctioned for his noncompliance. *See Newman v. State of Alabama*, 683 F.2d 1312, 1318 (11th Cir. 1982); cert. denied, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983). In his motion, the plaintiff cites the provision(s) of the injunction he wishes to be enforced, alleges that the defendant has not complied with such provision(s), and asks the

> court, on the basis of his representation, to order the defendant to show cause why he should not be adjudged in contempt and sanctioned. If the court is satisfied that the plaintiff has made out a case for an order to show cause, it issues the order to show cause.

*Wyatt By & Through Rawlins v. Rogers*, 92 F.3d 1074, 1078 n.8 (11th Cir. 1996). South Carolina Federal Courts and other Courts within the Fourth Circuit have regularly entered orders to show cause for violating an injunction. *See Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 263 (4th Cir. 2019); *Choice Hotels Int'l, Inv. v. Zeal*, LLC, No. 4:13-01961-BHH, 2016 WL 4055023, at *4 (D.S.C. July 29, 2016); *JTH Tax, Inc. v. M&M Income Tax Serv., Inc.*, No. 6:13-cv-00265-GRA (D.S.C. Feb. 6, 2013) (unpublished).

To establish civil contempt, each of the following elements must be shown:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's "favor"; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (cleaned up). Plaintiff can establish each of the *Ashcraft* elements.

## B. Argument

The Court's Injunction entered June 14, 2023, prohibits and/or requires the "Covered Persons," as defined under the Order, from:

- accessing, using, destroying, disclosing, or sharing Plaintiff's confidential information and trade secrets. (ECF 17);

- Requires all Covered Persons to maintain, preserve, and return Plaintiff's confidential information and trade secrets (paper and electronic copies). *Id.*

- From "conducting, carrying on, or engaging in any competitive business that was developed and/or implemented in whole or in part, directly or indirectly, through the use of any of Plaintiff's Trade Secrets and/or Confidential Information." *Id.* at 2, ¶ 7.

"Covered Persons" are defined pursuant to the Order as: "Defendant Jonathan Nelson, his agents, employees, representatives, and attorneys, and any other person acting in concert or participation with him (collectively, "Covered Persons")…" (*Id.*)

Whitehead Defendants meet the definition of "Covered Persons" as set forth in the Court's Injunction Order and have thus been subject to the Injunction since receiving notice of it in July 2023.  Whitehead Defendants have failed to comply with the Injunction in the following separate and distinct ways: (i) by not returning Plaintiff's confidential information and trade secrets (ECF No. 17 ¶ 6), (ii) by not maintaining and preserving Snider's confidential information and property (ECF No. 17 ¶ 5), and (3) by continuing to do business with Plaintiff's former customers whom the Whitehead Defendants wrongfully obtained with the benefit of Plaintiff's confidential information and trade secrets (ECF No. 17 ¶ 7).

In the Amended Complaint, Plaintiff alleged that Defendant Nelson and Whitehead Defendants "conspired and worked in concert to misappropriate Snider's confidential and trade secret information and to unlawfully solicit numerous Snider customers causing them to transition their business to Whitehead Tire resulting in Snider incurring irreparable harm and damages." (ECF No. 22 ¶ 1; *see id.* ¶ 38-59.)  Whitehead Defendants have admitted that they received Plaintiff's confidential information from Defendant Nelson and reviewed it.  (*See* ECF No. 34 ¶ 47-54.)  Moreover, it is beyond dispute that in numerous instances the Whitehead Defendants underlined[requested] that Defendant Nelson send them Snider's confidential information both during his employment with Snider and thereafter. (See **Exhibits 24, 26**; Declaration of Jonathan Nelson ¶¶ 10-17, 20-22, 26 at **Exhibit 28**.)  Accordingly, the Whitehead Defendants were "participating" with Defendant Nelson by willingly requesting, reviewing, and sharing Plaintiff's confidential information and are therefore clearly "Covered Persons" as defined in the Injunction Order and thus subject thereto.  *See JTH Tax, Inc. v. Lee*, 540 F. Supp. 2d 642, 647-49 (E.D. Va. 2007) (citing

Fed. R. Civ. P. 65(d) and *Vuitton v. Carousel Handbags*, 592 F.2d 126, 129 (2d Cir. 1979) (holding defendant's wife – a non-party – in contempt for violating an injunction because she had notice of it and was acting in concert with her husband).

### 1. The Injunction is in Favor of Plaintiff and Whitehead Defendants Had Notice of the Injunction.

On July 11, 2023, Plaintiff's counsel sent a letter to Defendants Whitehead Tire, Scott Chapman, and Jim Whitehead, Jr. (collectively, "Whitehead Defendants") advising them of entry of the Court's Preliminary Injunction Order (the "Injunction Order"), providing them a copy of the Order, and advising that they were Covered Persons subject to the Order. (*See* **Exhibit 29)**. Accordingly, the Whitehead Defendants have had notice of the Injunction Order. Additionally, the First Amended Complaint which was filed on September 8, 2023, and served on the Whitehead Defendants quoted the Injunction Order verbatim. (ECF No. 22 ¶ 63.)[3]

### 2. Whitehead Defendants Violated the Injunction and Had Knowledge of Such Violations.

As set forth above, the Court's Injunction Order requires Covered Persons to maintain, preserve, and return Plaintiff's confidential information and trade secrets (paper and electronic copies). (*Id.*) The Court's Injunction Order also requires the preservation of Snider's confidential information. Further, the Injunction Order enjoins Covered Persons from "conducting, carrying on, or engaging in any competitive business that was developed and/or implemented in whole or in part, directly or indirectly, through the use of any of Plaintiff's Trade Secrets and/or Confidential Information." (*Id.* at 2, ¶ 7.) Whitehead Defendants have violated each of those provisions of the Injunction Order.

---

[3] On May 5, 2023, prior to the filing of a lawsuit against any Defendant, Snider's counsel via letter asked Whitehead Tire if Nelson had disclosed any Snider information to them. Remarkably, Whitehead Tire did not respond.

Defendant Whitehead Tire, in its response to Plaintiff's First Set of Interrogatories No. 12, admits that it has not attempted to adhere to the Injunction Order arguing that it is inapplicable to them because it did not consent to the Injunction Order. (See Defendant Whitehead Tire's Response to Plaintiff's First Set of Interrogatories, No. 12 at **Exhibit 31**.) Accordingly, Whitehead Defendants have not even attempted to comply with the Court's Injunction Order.

A.    **The Whitehead Defendants Have Failed to Return and Preserve Snider's Confidential Information.**

The Court's Injunction Order expressly requires the Whitehead Defendants to return to Snider its property and confidential information as follows:

> Covered Persons are to return to Plaintiff its property including all Trade Secrets and/or Confidential Information that is in any Covered Person's possession, custody, or control (including but not limited to Trade Secret and Confidential Information in paper form **and in electronic form, wherever and however stored, including but not limited to personal computers, cloud storage, external storage media, smart phones and other handheld devices, and email accounts**) and to the extent that any such information is maintained **in electronic** or tangible form.

(Consent Order, ECF No. 17, ¶ 6) (emphasis added) To date, and after substantial delay, the Whitehead Defendants have only provided hard copies of documents. Such is insufficient to comply with the Court's Order to return data from computers, phones, cloud storage devices, or external storage devices such as travel drives has been provided. As defined by Webster's dictionary "Return" is defined as "to pass back to an earlier possessor." (*See Return*, MIRIAM WEBSTER (Mar. 9, 2024) https://www.merriam-webster.com/dictionary/return). That is not what the Whitehead Defendants did. Rather than return exclusive possession and control to Plaintiff of its own property, the Whitehead Defendants simply shared copies of documents with Plaintiff evidencing some of the documents they had misappropriated.

It is also apparent that the Whitehead Defendants have not preserved Plaintiff's information and data contained on company electronic devices including those of Defendant Chapman,

Defendant Whitehead Jr., and Whitehead employees Darrin Motes, Chris Harley, and Jason McDowell all of whom undisputedly participated in Whitehead Tire's misappropriation of Snider confidential and trade secret information. Such preservation is not only routine but is required in trade secret cases of this type. *See, e.g., URS Corporation v. Isham,* No. 6:09-2955, 2010 WL 3766853 (D.S.C. Sept. 20, 2010) (trade secrets case wherein the court ordered computer devices to be provided to designated expert for forensic imaging examination pursuant to an established examination protocol)).

Defendant Whitehead Tire's response to Interrogatory No. 8 inquiring into its efforts to investigate their misappropriation is telling.

> "JWT states that Jim Whitehead, Jr. and Scott Chapman have searched their devices and accounts and provided that information to their counsel.  JWT has also instructed other employees who may have responsive information to provide it to JWT's counsel."
> (Defendants' Responses at **Exhibit 31**.)

The Whitehead Defendants' March 6, 2024, document production evinces that on February 14, 2024, Whitehead employee Jason McDowell emailed a series of highly confidential documents containing Snider confidential and trade secret information to his counsel. (See **Exhibits 3, 10, and 27**.)  Obviously, Whitehead Tire remains in possession of Plaintiff's confidential information and has not taken steps to isolate or segregate Snider's trade secrets as Defendant Chapman was in possession of Snider's trade secret information as of February 14, 2024, more than nine (9) months after Whitehead was advised of the lawsuit against Nelson (May 5, 2023) and seven (7) months being given notice of the Court's Preliminary Injunction Order on July 11, 2023. Accordingly, the Whitehead Defendants have failed to disgorge themselves of Plaintiff's confidential and trade secret information and the Defendants' misappropriation continues.

Plaintiff has been diligent and consistent throughout that the Defendants must preserve and return Snider's confidential documents.  (*See, e.g.*, **Exhibit 22 -** July 11, 2023, letter).   The

Whitehead Defendants have failed to allow Plaintiff's (or a neutral) computer forensic expert to verify whether they are still in possession of Plaintiff's information or how the information may have been used or disseminated.  This is a blatant violation of Paragraphs 5 and 6 of the Injunction Order and contrary to the Whitehead Defendants' promises in their pleadings to do just that. (ECF No. 34; ECF No. 35.)

Most recently, on February 16, 2024, the Whitehead Defendants stated their refusal to allow inspection of their electronic devices that were used to carry out their misappropriation requiring Plaintiff to file a Motion to Compel. (ECF No. 63).[4]

> **b. Whitehead Defendants have Violated the Court's Order by Continuing to Service Customers Obtained in Whole or in Part, Directly or Indirectly Through the Use of Plaintiff's Confidential Information.**

Whitehead Tire is in further violation of the Court's Injunction Order as it is actively servicing former customers of Plaintiff that were solicited with the benefit of Plaintiff's confidential information and trade secrets.  (*See, e.g.*, ECF No. 22 ¶¶ 28-29, 47-48, 50-52.)  As just one example, it is undisputed that Defendant Nelson assisted the Whitehead Defendants with the solicitation of long time Snider customer Piedmont Concrete, which had been an exclusive Snider customer for over 20 years. (Declaration of Dave Jennings, **Exhibit 30**, ¶¶ 5 and 7.) Specifically, it is undisputed that:

- On January 17, 2023, Defendant Nelson (while still employed with Snider), texted Defendant Chapman of Whitehead Tire the phone number and identity of the contact person for Snider's customer Piedmont Concrete.  (ECF No. 22 ¶ 49; *see also* Declaration of Jonathan Nelson, attached as **Exhibit 28**, at ¶ 17.)

- On January 17, 2023, Nelson in a separate email to Defendant Chapman entitled "Piedmont Concrete" advised: "Scott, go by and see these guys when you can. This is not one to send Alton to, as they are not fans of him." (**Exhibit 16**.)

---

[4] It is noteworthy that while the Whitehead Defendants refuse to produce the devices they used to misappropriate Plaintiff's confidential and trade secret information, in their Third Set of Discovery Requests they requested a forensic image of Defendant Nelson's laptop computer.

- On January 17, 2023, Defendant Nelson (while still employed with Snider) provided Defendant Whitehead, via an e-mail to Defendant Chapman (scott@jimwhiteheadtire.com), with the contact information for Snider customer Piedmont Concrete and confidential information related to Piedmont Concrete's account.    Specifically, Defendant Nelson provided a file entitled "Piedmont Concrete Product Ranking 2022.TXT" which contains confidential and trade secret information including without limitation: pricing information, profit margins for specific products, top-selling products, and dollar profits. (ECF No. 22 ¶ 50; *see also* Declaration of Jonathan Nelson ¶ 22 at **Exhibit 28**.)

- Defendant Nelson voluntarily resigned his employment with Snider on or about January 2, 2023.  It was on or about this time that Snider lost Piedmont Concrete as a customer to Whitehead Tire. (Declaration of Dave Jennings ¶ 4 at **Exhibit 30**.)

- On February 23, 2023, Defendant Nelson texted Defendant Chapman asking if the latter had called on "Terry" (referring to Terry Bridges, Equipment Manager for Piedmont Concrete's fleet of trucks).   (Declaration of Jonathan Nelson ¶ 24 at **Exhibit 28**.)

- On or about January 17, 2024, Snider was informed that Whitehead Tire is servicing Piedmont Concrete as a customer and had been doing so since approximately January or February of 2023. (Declaration of Dave Jennings ¶ 7 at **Exhibit 30**.)

*See* Declaration of David Jennings ¶¶ 3-4, 7 (attached as **Exhibit 30**).  If that was not enough, three months <u>after</u> Defendant Nelson's departure Whitehead employee Darrin Motes texted Defendant Nelson, who was getting paid by Snider his monthly salary to honor his noncompete:

> "You don't have an old invoice for Piedmont Concrete do you?"

(Text at **Exhibit 26**.)   When Whitehead Tire was asked to admit via a Rule 36 Request for Admission that it was servicing Piedmont, Whitehead Tire evasively responded as follows:

> **Admission No. 9.**  Admit that Whitehead Tire continues to provide products and/or services to Piedmont Concrete at this time.

> **RESPONSE:**  Defendant incorporates by reference each of the General Objections stated above, Denied as stated.  Plaintiff admits that it does business with Piedmont. Defendant objects to Plaintiff's characterization of "continues to provide products and/or services" as it is not an accurate depiction of the relationship. JWT did not use any confidential information owned by Snider to procure clients, it has never employed Nelson, and it did not consent to be bound to the Snider/Nelson consent order. The customers referenced in the emails are well known in the industry.

(Defendant Whitehead Tire's Responses to Plaintiff's First Set of Discovery, pgs. 35-36 at **Exhibit 31**.)  Defendants' response, while evasive and deficient, reflects that Defendant Whitehead is in fact continuing to service former Snider customer Piedmont Concrete.

Another example is that on January 20, 2023, Whitehead Tire employee Darrin Motes texted Defendant Nelson stating: "Can you send me information on Thyson Krupp please."  (Text at **Exhibit 24**.)  On or about this time ThyssenKrupp texted Defendant Nelson advising that "we are going to move to Jim Whitehead Tire as of today. Let us know what you need from us."  (Email at **Exhibit 24**.)  Since that time Snider has ceased servicing ThyssenKrupp.

Plaintiff has also lost business with other customers for whom the Defendants misappropriated information and it is highly likely that further discovery will confirm the aforementioned customers are just the tip of the iceberg of customers wrongfully stolen away and which are being serviced by the Whitehead Defendants.

### c. Plaintiff Has Suffered and Continues to Suffer Harm and Sanctions are Warranted.

Due to Whitehead Defendants' ongoing violations of the Injunction Order, Snider continues to suffer harm.  To wit, Snider's confidential information and trade secrets – including competitive pricing and customer information – are still in Whitehead Defendants' possession and at risk of continuing to be used, accessed, or shared.  Snider also continues to suffer harm because it has lost customers to Whitehead Tire, who continues to unfairly profit from the Defendants' wrongful conduct.  Moreover, Plaintiff's delay and failure to preserve and image its devices increases the chance that key evidence will be lost forever or be spoliated.  It is further known that the Whitehead Defendants misappropriated Snider documents containing its customer playbook for accounts for its Columbia sales territory, and that Plaintiff has lost market share and sales of approximately $300,000.00 monthly.

"The appropriate remedy for civil contempt is within the court's broad discretion." *In re General Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193-94 (1949)).  Here, the Court would be well within its power and discretion to: (a) Require Defendants to disgorge and impose a constructive trust on any profits Whitehead Defendants have reaped from servicing Snider's former customers that they misappropriated confidential information concerning from the time Whitehead Defendants received notice of the Injunction to the present.  *See Ledo Pizza Sys., Inc. v. Singh*, Civil No. WDQ-13-2365, 2014 WL 1347113, at *4 (D. Md. Apr. 3, 2014) ("Disgorgement of profits is a valid compensatory remedy in civil contempt cases.") (citing *Buffalo Wings Factory, Inc. v. Mohd*, 574 F. Supp. 2d 574, 581 (E.D. Va. 2008)); (b) Impose coercive monetary sanctions against Whitehead Defendants.  *See Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004); and (c) Award Snider its reasonable attorney fees and costs incurred in the filing of this motion.  *General Motors*, 61 F.3d at 259.  Further, the Court should enjoin and/or order Whitehead Defendants: (c) to cease and desist servicing Snider's former customers; and (d) to immediately make available for forensic inspection and imaging all electronic devices used to access Snider's confidential and trade secret information that was shared with Whitehead Defendants by Defendant Nelson including all company and personal computer devices of any Whitehead Tire employee or agent involved in the misappropriation and unlawful conduct in this case including, but not limited to, Scott Chapman, Jim Whitehead Jr., Darrin Motes, Jason McDowell, and Chris Harley.

## V.  <u>MOTION FOR PRELIMINARY INJUNCTION AS TO WHITEHEAD DEFENDANTS</u>

### A.  Legal Standard

Snider also, or alternatively, moves for entry of a Preliminary Injunction as to the Whitehead Defendants.  In order to obtain a preliminary injunction, the moving party must establish (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the

absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *See The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citing *Winter v. Nat'l Resources Defense Council, Inc.*, 129 S. Ct. 365, 374-76 (2008)), *vacated on other grounds*, 559 U.S. 1089 (2010).  Plaintiff can easily meet its burden in this case.

**B.  Plaintiff is Likely to Succeed on the Merits of Its Claims.**

A plaintiff is not required to prove an absolute legal right when seeking a preliminary injunction but must present a reasonable question as to the existence of such a right.  *See AJG Holdings, LLC v. Dunn*, 674 S.E. 2d 505, 512 (S.C. Ct. App. 2009); *see also S.C. Elec. & Gas Co. v. Randall*, 333 F. Supp. 3d 552, 564 (D.S.C. 2018) (". . . plaintiffs need not show a certainty of success.").  Plaintiff can easily meet its burden and show that the Whitehead Defendants are likely to succeed on its Defend Trade Secrets Act claim ("DTSA"), 18 U.S.C. § 1831 *et seq.,* claim for aiding and abetting Nelson's breach of fiduciary duty, and claims for tortious interference with Defendant Nelson's employment agreement.

**1.  Plaintiff Will Succeed on its Defend Trade Secrets Act Claim**

"[T]he DTSA provide[s] this honorable Court with express authority to issue the injunctive relief sought by [Plaintiff] upon a showing of either actual or threatened misappropriation of its 'trade secrets.'" *Prysmian Cables & Sys. USA, LLC v. Szymansk,* 573 F. Supp. 3d 1021, 1037 (D.S.C. 2021) (citing 18 U.S.C. 1836(b)(3)(A)(i), which authorizes the court to grant an injunction "to prevent any actual or threatened misappropriation").  Actual and theoretical misappropriation exists in abundance in this case.  To establish a claim for misappropriation of a trade secret under the DTSA, a plaintiff must show: (1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to the employee; (3) disclosed by the employee in breach of that confidence; (4) acquired by the defendant with knowledge of the breach of confidence; and (5)

used by the defendant to the detriment of plaintiff. *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 725 (D.S.C. 2007).

### a. The Information Misappropriated Constitutes Trade Secrets.

Snider can establish the existence of trade secrets. "[A] trade secret may exist in a unique combination or compilation of information otherwise publicly available." *Prysmian Cables*, 573 F. Supp. 3d at 1037. Specifically, Snider's prices, pricing levels, product pricing and marings, customer contacts, customer contracts, costs, pricing, customer prospects, customer lists, and revenue information were misappropriated by Defendant Nelson both during his employment and after his employment with Snider ended. The South Carolina District Court has found that "[a]ll of this information is protected as 'trade secrets' because such information 'derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Id*. at 1038 (quoting *Pearl Ins. Grp., LLC v. Baker*, C/A No. 0:18-cv-02353-JMC, 2018 WL 4103333, at *4 (D.S.C. 2018)); *see also Bowe Bell Howell Co. v. Harris*, 145 Fed. Appx. 401, 404 (4th Cir. 2005) (affirming preliminary injunction related to customer list); *Uhlig LLC v. Shirley*, No. 6:08-01208-JMC, 2012 WL 2923242, at *5-6 (D.S.C. July 17, 2012) (holding the following were trade secrets: "i) historical sales and ordering information; ii) cost, production and workflow information; iii) pricing and revenue information;…v) historical customer service…information; and vi) projection and sales prospect information")[5].

### b. Plaintiff Communicated its Trade Secrets to Defendant Nelson in Confidence.

---

[5] Moreover, the Defendants' misappropriation in concert with Defendant Nelson constitutes a breach of the nondisclosure and return of property covenants in Defendant Nelson's employment Agreement and Plaintiff's claims against the Whitehead Defendants for tortious interference with Defendant Nelson's contractual obligations does not require a showing of trade secret status.

As Plaintiff's Business Development Manager for South Carolina, Defendant Nelson was granted substantial access to Snider's confidential information and trade secrets. Thus, Plaintiff clearly "communicated" its trade secrets to him. (ECF No. 22 ¶ 12-15.) Defendant Nelson was aware of the sensitive nature of the trade secrets and he acknowledged in his employment agreement that they were shared with him in confidence. (ECF No. 22 ¶ 16-18 (discussing "Covenant Not to Disclose Confidential Information").)

### c. Defendant Nelson Disclosed Plaintiff's Trade Secrets to Whitehead Defendants in Breach of Confidence.

It is undisputed that Defendant Nelson disclosed Snider's trade secrets to Whitehead Defendants in breach of confidence and in breach of his employment agreement and that the Whitehead Defendants received it. (*See* Section III. D. *supra*, ECF No. 34 ¶ 47-54; *see also* Declaration of Jonathan Nelson ¶¶ 15-22, 25 at **Exhibit 28**.) Specifically, it is known that Defendant Nelson shared confidential Snider documents with the Whitehead Defendants well in excess of twenty occasions. (See Section III, pgs. *infra*.) Additionally, it is known that in numerous instances the Whitehead Defendants asked Defendant Nelson for Snider's confidential information both while Defendant Nelson was employed with Plaintiff and during the time he was obligated to serve a paid noncompete period. (**Exhibits 24, 26**; Declaration of Jonathan Nelson ¶10, 11, 12, 13, 14, 15, 16, 21, 22, 26 at **Exhibit 28**.)

### d. Whitehead Defendants Had Knowledge that Defendant Nelson Committed a Breach of Confidence by Sharing Snider's Trade Secrets.

Whitehead Defendants admit they were aware of Defendant Nelson's contractual obligations to Snider. (ECF No. 34 ¶ 41.) As a sophisticated competitor that utilizes employment agreements and restrictive covenants to protect its own confidential information, Defendant Whitehead Tire knew that the information Nelson provided was in breach of the confidence Snider

had entrusted in him. (*See, e.g.*, Declaration of Jonathan Nelson ¶¶ 5, 23 at **Exhibit 28**) (acknowledging sending a copy of his Snider contract and covenants to Whitehead Tire) Indeed, Whitehead Tire repeatedly sought and received information from Defendant Nelson when he was actively employed with Plaintiff Snider. (*Id.* ¶¶ 10-22.) (*See* Section III. D. *supra*.)

> **e. Whitehead Defendants Used Snider's Trade Secrets to Snider's Detriment.**

There is no reasonable dispute that Defendant Nelson while employed with Snider and thereafter provided Whitehead Tire with Snider confidential and/or trade secret information and his assistance concerning Snider customers. (*See* Section III, *supra*.) It is also not disputed that the Whitehead Defendants used Snider's trade secrets – including specific product and customer pricing information – to solicit and steal several of Snider's clients including Piedmont Concrete. Snider is informed and believes Whitehead Defendants continue servicing those clients to this day, including but not limited to Piedmont Concrete and ThyssenKrupp. (*See* Declaration of David Jennings ¶¶ 3-4, 7 at **Exhibit 30; Exhibit 24**.) Moreover, it is known that the Whitehead Defendants on numerous occasions asked Defendant Nelson for confidential Snider documents and upon receipt shared the documents within Whitehead Tire. (*See* Section III, *supra*; **Exhibits 3, 4, 8, 9, 10, 11, 12, 14, 15, 24, 25**; Declaration of Jonathan Nelson ¶¶ 10-17, 20-22, 26 at **Exhibit 28**.) By way of an example, on January 19, 2023, Defendant Nelson texted a Snider confidential document containing highly confidential pricing information to Defendant Chapman whom after receiving Plaintiff's confidential document replied: "Pricing looks pretty strong." (**Exhibit 17**.) There can be no doubt that Defendant Chapman accessed, analyzed, and used Plaintiff's misappropriated information.

Based on the foregoing, Plaintiff has demonstrated a likelihood of success on the merits of its DTSA claim against Whitehead Defendants.

### 2. Plaintiff will Succeed on its Aiding and Abetting and Breach of Duty of Loyalty Claims

"The elements for aiding and abetting a breach of fiduciary duty are (1) a breach of a fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages." *Bennett v. Carter*, 421 S.C. 374, 380 (S.C. 2017) (citing *Future Grp., II v. Nationsbank*, 324 S.C. 89, 99 (1996)).

It is beyond dispute that Nelson breached fiduciary duties he owed to Plaintiff including by assisting his employer's direct competitor to steal away Plaintiff's confidential information and customers. *See* Nelson's Ans. to Am. Compl. (ECF No. 43) at 2-4 (admitting Paragraphs 28, 44-46, 47, 48, and 50-51 of the Amended Complaint, which allege Nelson downloaded Snider's confidential documents and provided them to the Whitehead Defendants in violation of restrictive covenants).

It is also undisputed that Whitehead Defendants knowingly participated in and encouraged Nelson to breach his fiduciary duties to Snider. (*See* Declaration of Jonathan Nelson ¶¶ 5, 23 at **Exhibit 28**) (admitting that he sent a copy of his employment contract and covenants to Whitehead Defendants in 2020); (*see also id.* ¶ 10-14) (admitting that various Whitehead Tire employees including Whitehead Jr. and Chapman asked Nelson to provide them with Snider's confidential information). Indeed, Whitehead even encouraged and induced Nelson to breach his duties of loyalty and contractual obligations while he was still employed with Snider. Specifically, it is currently known that the Whitehead Defendants solicited Defendant Nelson for confidential documents and information including, without limitation as follows:

2. On January 20, 2023, Whitehead employee Darrin Motes texted Defendant Nelson stating: "Can you send me information on ThyssenKrupp please." To which Nelson replied "yes." (Text at **Exhibit 24**.)

3. On April 20, 2023, Whitehead Tire employee Darrin Motes texted Defendant Nelson requesting an "old invoice for Piedmont Concrete." (Text at **Exhibit 26**.)

28

4.  Prior to Nelson separating from Snider Tire, and thereafter, Whitehead Tire solicited Nelson for confidential information regarding Snider Tire's products and customers including customer specifics, pricing information, customer contact information, product pricing information, and customer vulnerabilities such as which customers may be a good target for Whitehead Tire to solicit. (Declaration of Jonathan Nelson ¶ 10 at **Exhibit 28**.)

5.  Prior to Nelson separating from Snider Tire, Nelson was solicited for Snider Tire confidential business information by numerous Whitehead Tire employees including Scott Chapman, Darrin Motes, and Jason McDowell. (Declaration of Jonathan Nelson ¶ 11 at **Exhibit 28**.)

Upon receiving Plaintiff's confidential information the Whitehead Defendants often further disseminated it amongst themselves. (See **Exhibits 3, 4, 8, 9, 10, 11, 12, 14, 15.**)

It is in cases just like this one where South Carolina Courts have held claims for aiding and abetting breach of fiduciary duty are viable and appropriate.  As held by the South Carolina District Court in *Nucor Corp. v. Bell*, 482 F.Supp.2d 714, 723 n.5 (D.S.C. 2007) (internal citations omitted):

> "If an employee has been induced to breach his duty of loyalty to his present or former employer, '[n]ot only may liability for such inducement be imposed upon the employee who is guilty of a breach of fiduciary duty, but it may also be imposed upon any others who have cooperated in or reaped the benefits of such a breach.' Thus, a company that hires its competitor's employees and then induces them to divulge their former employer's trade secrets, or aids or assists them to violate their trust, is liable to the former employer."

Id. at 723 n.5; *see also Vortex Sports v. Ware*, 378 S.C. 197, 204 (S.C. Ct. App. 2008) (finding in favor of plaintiff on claim for aiding and abetting breach of fiduciary duty where individual was working for a competitor while still employed with Plaintiff).

As set forth above, the Whitehead Defendants requested from Defendant Nelson Snider's confidential information, then accessed and used it – including specific product and pricing information – to solicit Plaintiff's customers.  Further, Whitehead Defendants continue servicing Plaintiff's customers to this day.  (*See* Declaration of David Jennings ¶¶ 4-5, 7 at **Exhibit 30**)

29

(confirming Whitehead Tire is still servicing Piedmont Concrete and has been doing so since at or near the time Nelson resigned). Moreover, documents just recently produced by the Whitehead Defendants show they misappropriated many more documents concerning hundreds of additional Snider customers, placing those customers and related damages at issue.

Based on the foregoing, Plaintiff is certain to succeed on the merits of its claim against Whitehead Defendants for aiding and abetting a breach of Nelson's fiduciary duties.

### 3. Plaintiff Will Succeed on its Tortious Interference with Contract Claim

"The elements of a cause of action for tortious interference with contract are: (1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages. An action for tortious interference protects the property rights of the parties to a contract against unlawful interference by third parties." *Dutch Fork Dev. Grp. II, LLC v. Sel Props., LLC*, 406 S.C. 596, 604, 753 S.E.2d 840, 844 (2012) (cleaned up).

As demonstrated above, there is no question: (1) that Nelson's employment contract with Snider is valid and enforceable; (2) that Whitehead Defendants were admittedly aware of Nelson's contract; and (3) that Whitehead Defendants intentionally procured the contract's breach by, *inter alia*, soliciting Snider confidential information from Nelson and his assistance with soliciting customers which are breaches of his express restrictive covenants. (*See* Section III. D.; Declaration of Jonathan Nelson at ¶¶ 5, 23 at **Exhibit 28**) (admitting that he sent a copy of his employment contract and covenants to Whitehead Defendants); (*see also id.* ¶¶ 10-14) (admitting various Whitehead Tire employees including Chapman solicited Nelson to provide Snider's confidential information). As for the fourth element, Whitehead Defendants have no valid legal justification for their tortious conduct. Snider is certain to succeed on its claim for tortious interference.

**B. Plaintiff will Continue to Suffer Irreparable Harm in the Absence of Preliminary Relief.**

Absent preliminary injunctive relief, Plaintiff will continue to suffer irreparable harm in the form of loss of exclusive use of its confidential information, and lost customers. It is well-established that "[w]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *R.J. Reynolds Tobacco Co. v. Phillip Morris, Inc.*, 60 F. Supp. 2d 502, 509 (M.D.N.C. 1999) (citing *Multi-Channel Cable T.V. Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994)). It is equally well-settled that "courts presume irreparable harm where a trade secret has been misappropriated." *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996).

After resigning from Plaintiff, Defendant Nelson took valuable confidential information regarding Plaintiff's customers so that he and the Whitehead Defendants could gain an unfair competitive advantage over Plaintiff. Defendant Nelson has shared that information with Whitehead Defendants, and the Whitehead Defendants armed with Snider's confidential information have used that information to solicit and/or service Snider's customers. It was confirmed on or about January 17, 2024, that Whitehead Tire after successfully soliciting Snider customer Piedmont Concrete with the aid of Snider confidential information and continues to sell to and service Piedmont Concrete in direct violation of the Court's Order. (*See* Declaration of David Jennings ¶¶ 3, 7 at **Exhibit 30**.)

There is no way to determine with any certainty the losses that flow from the loss of customers and loss of confidential information. Once a customer is lost or confidential information is disclosed, a court is without power to restore them. In such instances, injunctive relief is appropriate. *See Columbia Broad Sys., Inc. v. Custom Recording Co.*, 189 S.E.2d 305 (S.C. 1972) (rejecting argument that the availability of money damages was a sufficient basis upon which to

deny a motion for temporary injunction where there may be uncertainty in fixing the measure of damages, business goodwill is at issue, or where the wrongful act may continue); *Peek v. Spartanburg Reg. Healthcare Sys.*, 626 S.E.2d 34, 37 n.2 (S.C. Ct. App. 2005) (noting that the availability of monetary damages does not preclude injunctive relief where loss of business or business goodwill is at stake). "The loss of a trade secret is irreparable harm, and the threatened disclosure of a trade secret supports the imposition of injunctive relief." *Nucor Corp. v. Bell*, C/A No. 2:06-cv-02972-DCN, 2008 WL 9894350, at *20 (D.S.C. Mar. 14, 2008). "Further, the loss of a trade secret is difficult to measure in monetary damages because once the secret is lost, it is indeed lost forever. As such, even, the threatened disclosure of trade secret supports the imposition of injunctive relief." *Prysmian Cables*, 573 F.Supp.3d at 1044.

Consequently, Plaintiff has made a sufficient showing that it will suffer irreparable harm in the absence of preliminary injunctive relief.

**C**. **The Balance of Equities Tips in Plaintiff's Favor.**

A balancing of the equities in this case tips decidedly in Plaintiff's favor. Plaintiff expended considerable time and resources compiling information concerning its customers and creating and maintaining its relationships with the customers identified in the documents that Defendant Nelson misappropriated and provided to Whitehead Defendants. There is no demonstrable harm that could come to Whitehead Defendants if an Injunction is issued or expanded and they are enjoined from further misappropriating Plaintiff's confidential information and from carrying on business with Snider's former customers – i.e. Snider customers solicited and stolen using Snider's trade secrets.

**D. An Injunction is in the Public Interest.**

The Supreme Court has emphasized the importance to the public interest of protecting trade secret business information and in deterring commercial piracy:

> The necessity of good faith and honest, fair dealing is the very life and spirit of the commercial world. It is hard to see how the public would be benefited by disclosure of customer lists. . . .
>
> In addition to the increased costs for protection from burglary, wiretapping, bribery, and other means used to misappropriate trade secrets, there is the inevitable cost to the basic decency of society when one firm steals from another. A most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable; the state interest in denying profit to such illegal ventures is unchallengeable.

*Kewanee Oil Corp. v. Bicron Corp.*, 416 U.S. 470, 487 (1974). The public has an interest in courts requiring individuals to compete fairly rather than by unlawful means to divert and misappropriate a competitor's customers. *See Specialty Chems. & Servs., Inc. v. Chandler*, No. CIV.A.1:87CV-2338MHS, 1998 WL 618583, at *6 (N.D. Ga. Sept. 29, 1988) ("Certainly, there is a cognizable public interest in discouraging employees from succumbing to the temptation of easy profit by breaching their employer's trust and misappropriating proprietary information for their own gain."). Indeed, it has long been recognized in South Carolina that the "most important single asset of most businesses is their stock of customers." *Standard Register Co. v. Kerrigan*, 119 S.E.2d 533, 545 (S.C. 1961). Protection of this asset against misappropriation by an employee is recognized as a legitimate interest of the employer. *Id.* Thus, the public's interest will best be served by enjoining Whitehead Defendants from further using Plaintiff's trade secrets to obtain an unfair business advantage. *See Kelman Ltd. v. King*, No. 6:07-CV-402-GRA, 2007 WL 666782, at *2 (D.S.C. Feb. 27, 2007) (granting plaintiff's motion for preliminary injunction and enjoining former employee and his new employer from using, releasing, or disclosing trade secrets and confidential information, including the plaintiff's customer lists); *Rockford Mfg., Ltd. v. Bennet*, 296 F. Supp. 2d 681, 684, 690 (D.S.C. 2003) (granting preliminary injunction where the plaintiff alleged that former employees had "significant access to confidential, proprietary, and trade secret information" including confidential customer lists and proprietary cost, estimating, and pricing

data, and enjoining the former employees from using electronic files, data, and documents taken from the plaintiff).

## VI.   **CONCLUSION**

The facts supporting Plaintiff's Motions are beyond dispute.  The Whitehead Defendants engaged in a brazen and substantial misappropriation of Plaintiff's confidential and trade secret information, tortiously interfered, and aided and abetted Defendant Nelson in his breach of his contractual and legal obligations owed to Plaintiff resulting in lost customers, loss of competitive position, and the loss of confidentiality of its trade secrets.  Whitehead Defendants then violated the Court's Preliminary Injunction Order by failing to return to Plaintiff in electronic form its trade secret information and by continuing to service customers procured with the aid of Plaintiff's confidential business information.  Absent enforcement of the Court's Injunction Order, or entry of a preliminary injunction specific as to Whitehead Defendants, Snider will continue to suffer ongoing irreparable harm.

Based on the foregoing, Plaintiff respectfully requests that the Court grant Plaintiff's Motion and sanction the Whitehead Defendants as set forth in Plaintiff's Motion including requiring them to immediately abide by the Court's Order, immediately make available for preservation and inspection relevant computer devices involved in the misappropriation, place proceeds received from Plaintiff's customers which the Whitehead Defendants received confidential information and/or assistance from Defendant Nelson in a trust, prohibit the solicitation of new or additional business from customers identified in Plaintiff's documents which were misappropriated by the Defendants, and an award to Plaintiff of its attorney fees and costs incurred by Plaintiff in having to bring its Motion.

Plaintiff further requests the Court to grant a Preliminary Injunction enjoining and ordering the Whitehead Defendants as set forth in detail in Plaintiff's Motion including enjoining them from

utilizing, disclosing, or possessing Plaintiff's confidential information, order them to provide a written accounting of computer devices and e-mail accounts possessed by the Whitehead Defendants during the relevant time period, require a computer forensic review of those computer devices and email accounts, place proceeds received from customers identified in the documents misappropriated in a trust account of counsel, and prohibit them from soliciting new or additional business from customers identified in the documents misappropriated by Defendants.

This the 20th day of March 2024.              Respectfully submitted,

/s/ Lee M. Thomas
Nicholas S. Hulse (Fed. ID No. 12872)
Lee M. Thomas (Fed. ID No. 12799)
J. Michael Honeycutt (*pro hac vice*)
FISHER & PHILLIPS LLP
227 West Trade Street, Suite 2020
Charlotte, North Carolina 28202
Telephone: (704) 334-4565
Facsimile: (704) 334-9774
Email: nhulse@fisherphillips.com
Email: lthomas@fisherphillips.com
Email: jhoneycutt@fisherphillips.com
*ATTORNEYS FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I certify that on the 20th day of March 2024, ***Plaintiff's Memorandum of Law in Support Of Its Motion For Order To Show Cause Why Defendants Jim Whitehead Tire Service, Inc., Scott Chapman, and James L. Whitehead, Jr. Should Not Be Held in Contempt of Court for Violation Of Preliminary Injunction Order, And Or In The Alternative, Motion For Preliminary Injunction*** was served on Defendants via the Court's CM/ECF System, which will send notice to all counsel of record.

/s/ *Lee M. Thomas*
Lee M. Thomas
FISHER & PHILLIPS LLP
*ATTORNEY FOR PLAINTIFF*